apartment in Columbia, Illinois, and the wife continued to reside in the marital residence. Husband did not file a petition for dissolution of marriage until 2010, and on October 26, 2011, the trial court held a hearing on all remaining issues. At the time of the divorce trial, which Judge Geary heard in 2011, Eddie's gross income was $12,433 a month, with a net income of $8,266 a month. On the other hand, Shelly's income was $2,278 a month gross, and $420.06 per month net. A difference of almost $7,800 between the parties. At that time, a judgment was entered in November of 2011, which states as follows, that Eddie shall pay $3,000 per month to Shelly in maintenance, which shall be reviewed after a period of five years upon request of either party. Given the award of maintenance, Eddie's net income at the time was decreased to $5,266 per month, while Shelly's net income was increased to $3,420 per month. At that time, although the current statute set forth in 504 of the IMDMA was not in place, Shelly was earning approximately 40% of the net income of the parties. In November of 2016, Mr. Parker did file his petition to terminate or, in the alternative, modify maintenance based upon Judge Aguirre's order. At the time that the petition and answer were filed, the court had ordered the parties to submit a memorandum of law and to argue the issue of burden of proof in a review of maintenance proceedings. When both counsel for Eddie and counsel for Shelly appeared at the hearing, the court made a finding stating, quote, case called for oral argument on burden of proof, the parties reached the same conclusion in brief, end quote. Eddie did not have the burden of proving a substantial change in circumstances in this case. At the time that this case was decided, the relevant provisions of 504B8 stated that when hearing a review proceeding, the payee is required to show that she had a continuing need for maintenance. In Judge Kennedy's order of 2019, Judge Kennedy does not make any showing that Shelly still had a continuing need for maintenance, and I don't believe he could have made that finding for the following reasons. Mr. Parker had been employed for 41 years through Ameren at the time of his retirement. Contrary to Judge Kennedy's finding that he had retired at, quote, the earliest possible time, end quote, he was able to retire at the age of 55, which would have been seven years earlier. If he would have retired at age 55, his pension would have been reduced through Ameren. However, as Mr. Parker testified and was unrebutted by Shelly, Mr. Parker was receiving his full pension from Ameren, Illinois. The only pension that was reduced by a minuscule amount was his local 309 IBEW pension. Therefore, because the court on review is to look at what the parties have at the time of the trial, Mr. Parker's gross income was $4,460 a month, a net income of $3,479. Shelly's gross income was $3,982, a net of $2,939. At that time, Shelly's net income on July 17, 2017, was 46% of the net income of the parties. Eddie testified extensively about the reasons that he retired. Specifically, he had reached retirement age. He had been working for 41 years. He had always desired to retire. He had a physically demanding job. If you look at even as the appellee has argued, his income had been steadily declining in 2015, 2016, and 2017. Each year, his income had gone down due to working less. But I think the crux of this issue, and what I find to be most important, is when you look at the value of property that the parties had at the time of this trial, Shelly had equity and assets in excess of $75,000 to $80,000 of Eddie's assets at the time. At the time of trial in 2011, Judge Aguirre entered an order awarding Shelly a much larger part of the assets of the parties in consideration for the income of Eddie being slightly higher than Shelly's. I disagree with the appellee's statement that you cannot include Shelly's business checking account as an asset, which had $13,343. For that reason, Shelly was a doing business as hairstylist. In doing business as, that's Shelly. Shelly is that business. She files a tax return, her individual tax return. It's not a corporation. She has access to all those funds. Any income the business makes is income of Shelly's. Additionally, she's already accounted for those business expenses in her Schedule C on her tax return, as well as in her financial affidavit when she deducted the business expenses from her gross receipts. Shelly also argues that she has a negative $34,000 balance on her Nissan Murano, but does not consider the equity in that vehicle that at the time of trial was only approximately a year old. In addition, the annuity, while the appellant concedes that Shelly's annuity had to be drawn out annually at $2,212.50 per year, that annuity was funded in 2013 per the statement, and Shelly had put down $50,000 on that annuity. That has to be considered as an asset to Shelly because she does have access to those funds. I do believe that my chart indicating that Shelly's assets at the time of the review hearing were over $650,000 and Eddie's were just slightly over $560,000 has to be a significant consideration for the court. I do believe that this case is most like in Ray Marriage of Golden. In Ray Marriage of Golden, there was a 28-year marriage, and in that review, the court has to still find that maintenance is appropriate at the time that the review hearing is set. Even though this was a long-term marriage, and we agree that this was a long-term marriage, the court did not make any findings in its order under 504 that Shelly still had a need for maintenance, nor did the court make any finding that Eddie retired in bad faith. Counsel? Yes. Didn't the court find that basically, and I understand your client, you worked a long time, and he had a right to retire at 62, but he took that action, but didn't the court find that he voluntarily reduced his income by retiring early as that was his definition of divorce? Well, the court didn't make a finding that that was Eddie's definition of divorce. I do agree with you that Mr. Parker, in his testimony, had stated, Judge Gary told me I had five years, and that was argued extensively in the trial court, that Mr. Parker had always claimed that he was going to retire at the age of 62. That being said, the judge who tried the case in 2011 was not the same who tried the case in 2017, and so yes, the court found that he voluntarily retired, but there is no case law, and I haven't even been able to find a case law, that someone isn't entitled to retire. I haven't been able to find a rule of law that there's a specific retirement age, and again, I disagree with the court's finding that he retired at his earliest retirement age, because as I indicated, Mr. Parker testified that at 55, he could have retired. I hope that I answered your question. I think I did. Sure. Well, he can retire anytime he wants. It's just the question of, does that affect his maintenance? And on to that, Your Honor, I agree. If the court had found that he had inappropriately retired, or that he had retired early, I do think the court has to make some finding of what his income is, and in this case, the court didn't impute any income to Eddie. They basically said, okay, well, we're going to say he should have continued to pay $3,000. We'll deduct what she's getting from his pension, and he has to pay the difference, but there's no basis as to the income of finding of either parties in this order, as to why that 1555 number was the number he was still required to pay. One of the things that I really want to hit on, as well, is the standard of living established during the marriage for these parties. Throughout the divorce, from 2011 until 2017, Shelly continued to reside in the marital residence where they had always lived, continued to reside in the marital residence without a house payment, out in the country, whereas Eddie had lived in town in a two-bedroom apartment. If anyone now, admittedly, at the time of trial, he had moved to a cabin in Arkansas, and he testified that he was using space heaters, that the washing machine was outside. He was living a fairly simple life, but when you're looking at the standard of living during that marriage,  I would also argue that at the time that this case was heard under Section 504B1, unless the court finds that maintenance is appropriate, it shall bar maintenance regardless of the length of the marriage. I understand the court weighs heavily on the length of the marriage. He still doesn't make any explicit finding that maintenance was appropriate, or any findings under that section. I do believe that this case is very factually distinguishable from some of the cases that the court cited. For example, in Ray marriage of Shen, it's hardly comparable in this case when the wife, in Shen, had been homeless and living in her car or hotels, and she was living on personal loans and help from family and friends. In that case, I can see why the court would make a finding that husband still had an obligation to pay. Wife was homeless. That's not anywhere near the case here. I do think Van Hovland is somewhat more applicable, and even in that case, the court made a finding that the husband had been fired for cause. This is the case where he was a police officer, and he had not followed a policy of the department, and even though he was fired for cause, the court did not make a finding that it was a bad faith reduction in income. I also disagree with the court's reliance on Ruvola. The Ruvola case out of the second district in 2017, in that case, the court imputed income to the payee, the person receiving maintenance and not the payor, and in that case, husband just generally didn't get a job, and the court imputed $25,000 per year of income to the husband. Again, as in this case, in the underlying case, Judge Kennedy made no such finding. So to summarize, we are requesting that the court reverse Judge Kennedy's order, remand the case to order a termination of maintenance, and for any other relief that this court deems appropriate. Thank you. Thank you, Counsel. You'll have time in reply. Ms. Lindveth, whenever you're ready. Thank you. May it please the court, Justices, Counsel, Janie Lindveth for the appellee, Shelley Riker, we are asking today that you affirm the judgment of the trial court and deny the relief that is being sought by the appellant. The appellant's overarching argument in the appeal is that the trial court abused its discretion by modifying his maintenance obligation. Appellant's argument is basically that the trial court erred by granting him the specific relief that he requested in his petition to terminate or in the alternative, modify maintenance. In response to the appellant's argument that the trial court did not make an explicit finding that Shelley had a continuing need for maintenance, the Illinois Supreme Court has held that when a basis for an award of maintenance is established in the record, it is not mandatory for a trial court to make explicit findings. The record here clearly establishes the need for continued maintenance. The parties were married for 30 years. Shelley was 18 at the time of the marriage. She was primarily responsible during the marriage for raising the children and keeping the home. And she held no other employment before the marriage, during the marriage, or even after the marriage other than cutting hair during the marriage that was in the actual marital home where she was raising the children. Eddie was able to advance in his career during the party's 30-year marriage and develop significant experience, skills, and knowledge, which he testified to, to increase his income each year, which he specifically also testified that he was able to do while maintaining the same number of hours, by working the same number of hours that he did during the marriage, and by reducing his physical requirements through the numerous accommodations that he testified Amron made for him. The appellant argued that there was agreement that Eddie's income was decreasing before he retired. That's completely untrue, and nowhere in our brief do we state that. In fact, we actually state the opposite. In 2011, when the parties were divorced, Eddie's gross income from Amron was $158,000. In 2015 and 2016, his gross income was $177,000, almost $178,000. And in 2016, it was $166,000, which does include some dividend and interest income. But his Amron wages had increased substantially from the time of the judgment of disillusioned marriage. His average gross income from his last two full years of working before he elected to voluntarily retire was over $14,000 per month. By electing to retire, he voluntarily reduced his income by almost 70% to about $4,400 per month. So I'm curious in terms of the argument with regard to his choice to retire. I mean, I understand this argument when someone voluntarily leaves a job for a lower-paying job or does something to cause themselves to be fired from a job. But is the argument that he retired at 62 as opposed to waiting until he was 67? Would we have the same argument being presented if he had waited until he was 67 to retire? I probably can't completely answer that, Your Honor, because I think it would depend on the circumstances. But I would say that 62 is considered to be early retirement by the department. But it's without any reduction in the retirement amount, correct? It's without any reduction in his pension, but he would have continued to actually earn further retirement benefits had he continued to work at Amron. But if we take my question a little bit further, if at 67 you choose to retire, and let's say you reduce your income by more than half because of your retirement, you could also choose not to retire at 67 and keep earning that 50% more. So are we suggesting that anytime someone is divorced, they can never retire without being subject to continuing to pay maintenance as though they were fully employed prior to retirement? No, Your Honor, I'm not suggesting that at all. I think if you look at the specific facts in this case, Mr. Riker reduced his income, sorry, Mr. Parker reduced his income, not just, he reduces income by 70% because he was continuing to earn a significant salary while any physical limitations, any physical ailments or limitations that he alleged that he had were being accommodated by Amron. He retired the first full year that he could retire without his actual pension being reduced, but his income was still reduced by 70%. He had worked up until the time he could legally retire. And the testimony was that he had intended to retire at 62 for several years even prior to the divorce. Am I wrong on that? Go ahead. He did testify to that, Your Honor, but he also testified numerous times to the fact that he no longer wanted or expected to have a maintenance obligation to his wife or worry about supporting her, providing any support to her. Again, in looking at the totality of the circumstances, even aside from that, Mr. Parker was earning a substantial income that, again, he was able to do so with being accommodated for all of his physical limitations. He was earning substantially more than he had been previously, working the exact same number of hours, moving into a supervisory role. What I keep hearing, though, is that even though you're legally able to retire, you've worked 41 years at a job and you're entitled to retire any time between 62 and 67, if you're earning a good income and you don't have a physical limitation that keeps you from earning it, you have to keep working if you're divorced in order to pay a maintenance. You don't necessarily have to keep working, Your Honor, but if you are under a maintenance obligation, you paid five years of maintenance for a 30-year marriage. That part I agree with you. I understand that part fully. It's a five-year deal. If he would have waited until he was 67, it would have given her five more years. He would have been 10 years in. Would that have made a difference? Well, the thing is, and I guess this is the point I want to make as well, he can choose to retire at any point, but then asking the court for that to reduce his maintenance obligation, the inverse of your argument would be true in that case. A party under a maintenance obligation could choose to retire at any point just to evade their obligation. Again, in this case, given the explicit testimony of Mr. Parker, in that he no longer wanted to have to worry about paying this maintenance to his wife, no longer wanted to have to even think about her or her expenses or anything along those lines, and that he had decided five years was it. That was all he was going to pay, I think demonstrates more so that the retirement, he chose to retire. He didn't care about his maintenance obligation. He stopped paying it, actually, and unilaterally without a court order. And again, he can retire, but he's still responsible for the full obligation that he has. I know that counsel brought up that there was no basis for the court's modified maintenance award, but it's actually pretty clear what the court did. Ms. Reichert was receiving $3,000 per month or was supposed to be receiving $3,000 per month for maintenance purposes. So in that the appellant chose to retire early, Ms. Reichert was receiving a portion of his pension. So the court reduced the maintenance obligation by the value of the monthly pension that she was receiving. What did that reduce the maintenance requirement to? Do you recall? I don't want you to waste time having to look through it. I just thought if you do that, I'll slap your head. It's, I believe, $1,555.75 per month. That was the new amount that he was ordered to pay?  Okay. And again, the appellant did file a petition to terminate or in the alternative modify. So the relief that was actually granted to him was exactly what he had requested. It was modified looking at the fact that, like I said, my client was receiving her share of his Ameren pension. And again, this was discussed at length in our brief, but Ms. Reichert did take significant steps to increase her income from the time of the party's divorce. She obtained her instructor's license, her barber's license. Excuse me. She began accreditation work in addition to her salon services. She took classes to potentially work in a financial aid office so that her income wouldn't be affected if she felt like she physically could not continue it. She, in fact, increased her income from $11,000 to $41,000 at the time of the judgment, right? I mean, she did take steps to increase her income quite a bit. I had her income being around $30,000 gross, but I think your calculation may include the maintenance that she's receiving. But yes, she had taken substantial steps. There was actually nothing else that she could do to increase her income. I do also just want to briefly state that, again, the assets as represented by the appellant are a misstatement. Mr. Parker actually has significantly or actually has more assets, more in assets than Ms. Reichert does. The checking account, the business checking account that was referenced by counsel in her oral argument, again, the evidence, the tax returns, and the testimony all demonstrated that that checking account is a business account used for business-related expenses. And Ms. Reichert showed that she incurred approximately $15,000 in business expenses that she testified were necessary for her to maintain her work in both 2015 and then again in 2016. Mr. Parker misstated that neither party has any liabilities. It's actually only him that doesn't have any debts. Ms. Reichert has a vehicle that has over $34,000 in debt. The annuity was also misvalued. If my client were to choose to cash that out, she'd only have about $2,000. The actual assets show that Mr. Parker has $563,000 in assets while Ms. Reichert has only about $555,000. Even if, though, she were to have more in assets, she's not required to impair her capital to generate income to pay her monthly expenses. As far as the standard of living argument that was made, Ms. Reichert did testify that she had looked at downsizing to a different residence. But because she used the former Marigold residence to also provide her salon services, to rent salon space and find another residence would actually end up costing her more. So that's why she maintained the Marigold residence. She did not testify to any extravagant trips or anything like that, whereas Mr. Parker purchased 100 acres of land for $160,000 in cash a few months before the hearing. He testified to over $13,000 of additional expenses just to haul rock, purchase two tractors. He testified he would use to mow fields, purchase an air compressor, chainsaws, weed eater, a blower. He was voluntarily paying for his daughter's wedding. He'd taken multiple trips to Portland. His standard of living had probably increased, actually, whereas our client was just struggling to maintain what she had during the marriage. And just briefly, regarding Mr. Parker's election to retire early, the court has to find either that he voluntarily became unemployed, he's attempting to evade a support obligation, or he has unreasonably failed to take on an employment opportunity. In this case, Mr. Parker has demonstrated all three. He chose to retire in the middle of the proceedings, before trial, before the court ruled. He testified that he only wanted and expected— Did the court find these things? Is this your position or is this the court's position in its order? I guess I'm testifying more so to the record. You seem to be testifying, so— Sorry, not testifying. I'm sorry. I'm speaking—sorry. I'm speaking more to the record. The court did find that Mr. Parker had voluntarily become unemployed. He provided no medical evidence, no medical testimony, no documentation from Ameren that he was forced to retire. And he actually testified that, again, Ameren had made numerous accommodations for him to ensure that he would maintain his license, that he would be able to work without having to do any of the physical activities that he testified he couldn't do anymore because of these alleged health conditions. So, for those reasons, Your Honor, and the reasons outlined further in our brief, we are asking that the judgment of the trial court be affirmed. Thank you very much. Ms. Stabler, you have five minutes in reply. Thank you. First, I'd like to hit on the mysticized allegation that we got the relief requested and that maintenance was modified. I agree that we filed a petition to terminate maintenance or, in the alternative, modify maintenance. As the justices are aware in all practicing law, at the time that we file our pleadings, we don't have copies of tax returns. We don't have copies of bank statements. We don't know what Ms. Reichert's income is. So, if, for example, her income had maintained the same and been the same in 2011 as it was in 2017, Mr. Parker still would have had a small maintenance obligation, potentially, just along with his pension and his Social Security benefits. However, I believe that the record supports and fully shows that Ms. Reichert's income had increased significantly since the time of the divorce, that she was able to accumulate $135,000 in a savings account in the five years since the divorce, which is not too short of the $3,000 a month that she was receiving from Mr. Parker. With regards to the same claim that Ms. Desai had, at this time, on a review, the court is to look at the status of the parties at the time of the review. At the time of the review and at the hearing, Mr. Parker was retired. This court's order effectively requires him to use all of his liquid assets to pay this maintenance and spousal support. Every month, he is being depleted of this income while she is not. So, again, my concern with the way that Ms. Desai is misstating these, while modification was requested, that was an alternative in the event that the backs had come out differently. And, again, back to the modification, there's still no basis in the record as to how the court made that finding to the support amount that even that $1,555 a month was appropriate. I agree with Ms. Desai completely. You keep saying Ms. Desai. I apologize. I apologize. I'm really bad about using maiden names. I'm sorry, Ms. Lindveth. When – excuse me. When we are looking at – oh, the retirement age. And, Justice Barberis, that was a question that you posed was a question that I asked the trial court. Is there a magic age to retire? At what age are you allowed to retire? When you have a support obligation, do you have to continue working until your spouse decides that they don't want – former spouse decides that they don't want maintenance anymore? And I think that that's what the court failed to make a finding to. The court did make a finding that he found that 65 was the appropriate retirement age. I could not find any case or any basis that the court has stated that there is an appropriate retirement age for every single case in every single circumstance. So, I don't know why 65 is the magic age, but 62 is what Mr. Parker testified to. He said he had been thinking since he was about 50 he was going to retire at 62. I think the court can infer, and it's not a coincidence, that Judge Aguirre set this matter for review exactly at the time that Mr. Parker said he was going to retire. If Judge Aguirre had said, okay, I'm going to do five years' worth of maintenance, which he was more than permitted to do in 2011, and Mr. Parker chose not to retire, then that would be detrimental to Ms. Reichert. If Judge Aguirre, he could have said permanent maintenance, but he did not, and I think that's incredibly distinguishable. If Ms. Reichert had felt that the judge should have awarded her permanent maintenance, she should have appealed the case in 2011 and said that finding it to be reviewable, rehabilitative, was against the manifest weight of the evidence. Now she's complaining that it was set for review, that he wasn't allowed to retire, and I don't believe that that's set forth in the facts or in the law. So, again, we would ask that this court reverse the finding of the trial court and remand to order a termination of maintenance retroactive to when Mr. Parker retired. Thank you. Thank you both for your arguments. The court will take the matter under consideration and issue its order in due course. You all have a good rest of the day. Thank you so much. Take care.